RECORD NO. 15-1753

In The

# United States Court of Appeals
### For The Fourth Circuit

## STEPHEN E. BILENKY, Administrator of the Estate of Frank S. Wright, deceased,

*Plaintiff – Appellee*,

**v.**

## RYOBI TECHNOLOGIES, INCORPORATED,

*Defendant – Appellant*.

**and**

**HOME DEPOT USA, INCORPORATED; ONE WORLD TECHNOLOGIES, INCORPORATED; TECHTRONIC INDUSTRIES NORTH AMERICA, INCORPORATED; TECHTRONIC INDUSTRIES COMPANY, LIMITED; RYOBI NORTH AMERICA, INCORPORATED; RYOBI LTD.; THE HOME DEPOT, INCORPORATED,**

*Defendants*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

_____

## BRIEF OF APPELLANT

_____

**Robert L. Wise**
**Davin M. Rosborough**
**BOWMAN AND BROOKE LLP**
**901 East Byrd Street, Suite 1650**
**Richmond, Virginia  23219**
**(804) 649-8200**

*Counsel for Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1 and Local Rule 26.1, Ryobi Technologies, Incorporated, who is appellant, makes the following disclosure:

1. Is the party a public held corporation or other publicly held entity?

    ( )    YES                    (X )   NO

2. Does the party have any parent corporations? If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

    ( )    YES                    (X)   NO

Regarding questions 1-3, Ryobi Technologies, Inc. is no longer in existence. Before ceasing to exist, Ryobi Technologies, Inc. was an indirect but wholly owned subsidiary of Techtronic Industries Co., Ltd., a Hong Kong corporation whose stock is publicly traded on the Hong Kong stock exchange.

3. Is 10% or more of the stock of a party owned by a publicly held corporation or other public held entity? If yes, identify all such owners:

    ( )    YES                    (X)   NO

Regarding questions 1-3, Ryobi Technologies, Inc. is no longer in existence. Before ceasing to exist, Ryobi Technologies, Inc. was an indirect but wholly owned subsidiary of Techtronic Industries Co., Ltd., a Hong Kong corporation whose stock is publicly traded on the Hong Kong stock exchange.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

( X )  YES                    ( )    NO

Millhouse Insurance Company has paid costs of defense to date and is a 100% owned subsidiary of Husqvarna AB, which is a publicly held entity.

5.  Is the party a trade association?

( )    YES                    (X)    NO

6.  Does this case arise out of a bankruptcy proceeding?

( )    YES                    (X)    NO

Signature: /s/ Robert L. Wise         Date: September 29, 2015_____

Counsel for:  Ryobi Technologies, Inc.

# **TABLE OF CONTENTS**

**Jurisdictional Statement**......................................................................1

**Statement Of Issues**............................................................................2

**Statement Of The Case**.......................................................................3

   A. Pretrial Proceedings ......................................................................3

   B. Trial Proceedings ...........................................................................9

   C. Jury verdict, post-trial motions and ruling ..................................18

**Summary Of Argument**......................................................................19

**Argument** ..........................................................................................20

   I. The district court's misapplication of the "apparent manufacturer" doctrine to hold Ryobi Technologies liable despite its lack of involvement in the tractor's line of distribution; and independently, its misapplication of Virginia product liability law in entering judgment despite insufficient evidence on defect and causation both require reversal and entry of judgment for Ryobi Technologies ...............................................................20

      A. The district court fundamentally misapplied the apparent-manufacturer doctrine by ignoring the plaintiff's lack of evidence to prove that Ryobi Technologies had anything to do with this tractor.......................................................................................21

         1. The apparent-manufacturer doctrine requires proof that the defendant was involved in the product's chain of production or distribution—a requirement that the district court ignored, and for which there is no record support...................................................................23

         2. There was no evidence that Ryobi Technologies was connected to the "Ryobi" on the lawn tractor at issue, and no evidence that it "put out" the lawn tractor "as its own." ...........................................................27

      B. The district court misapplied Virginia product liability law by affirming the verdict despite the lack of legally sufficient evidence of both defect and causation, under any theory........................................32

         1. The district court also misapplied Virginia law by affirming the judgment despite a lack of legally sufficient evidence to support a defect under any negligence theory.....................................................33

            a. There was not legally sufficient evidence of a design defect .......33

iii

       b.  There was not legally sufficient evidence to support a negligence finding based on failure to warn ....................................................38

       c.  There was not legally sufficient evidence to support a negligence finding based on failure to inspect or test ......................................40

   2.  The judgment likewise lacks legally sufficient evidence to support causation under any negligence theory ...............................................41

       a.  There was not legally sufficient evidence of causation with respect to any design defect .........................................................................43

       b.  There was not legally sufficient evidence of causation with respect to any failure to warn ...................................................................47

       c.  There was not legally sufficient evidence of causation with respect to any failure to test ....................................................................48

II.  If the Court does not reverse and enter judgment Ryobi Technologies, it should nonetheless grant a new trial due to several harmful, prejudicial, and reversible errors .................................................................................................49

   A.  The district court usurped the jury's role when it struck two bases for the contributory negligence defense, despite sufficient evidence, and then compounded the error with an improper and prejudicial jury instruction .................................................................50

   B.  The district court applied the wrong test under Rule 37, resulting in unwarranted and disproportionate sanctions ...........................................54

   C.  The district court abused its discretion in allowing the plaintiff to present false evidence that the court had already excluded in a prior ruling .......................................................................................60

**Conclusion**................................................................................................................62

**Statement With Respect To Oral Argument**.......................................................63

# TABLE OF AUTHORITIES

Page

## Cases

*Affiliated FM Ins. Co. v. Trane Co.*,
  831 F.2d 153 (7th Cir. 1987) ................................................... 25, 31

*Alevromagiros v. Hechinger Co.*,
  993 F.2d 417 (4th Cir. 1993) ................................................ *passim*

*Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*,
  155 F.3d 500 (4th Cir. 1998) ........................................................55

*Anderson v. Westinghouse Savannah River Co.*,
  406 F.3d 248 (4th Cir. 2005) ............................................ 54, 59–60

*Artrip v. E.E. Berry Equip. Co.*,
  397 S.E.2d 821 (Va. 1990) ...........................................................50

*Ball v. Takeda Pharm. Am., Inc.*,
  963 F. Supp. 2d 497 (E.D. Va. 2013) ....................................... 33, 40

*Barlow v. Colgate Palmolive Co.*,
  772 F.3d 1001 (4th Cir. 2014) ......................................................54

*Butler v. Navistar Int'l Transp. Corp.*,
  809 F. Supp. 1202 (W.D. Va. 1991) .......................................... 42, 47

*Carney v. Sears, Roebuck & Co.*,
  309 F.2d 300 (4th Cir. 1962) .............................................. 23, 26, 30

*Cotton v. Buckeye Gas Prods. Co.*,
  840 F.2d 935 (D.C. Cir. 1988) ................................................. 42–43

*Featherall v. Firestone Tire & Rubber Co.*,
  252 S.E.2d 358 (Va. 1979) ...........................................................38

*Figg v. Schroeder*,
  312 F.3d 625 (4th Cir. 2002) ................................................. 50, 54

*Fletcher v. Atex, Inc.*,
  68 F.3d 1451 (2d Cir. 1995) ..................................................... 24, 25

*Fontenot v. Taser Int'l, Inc.*,
  736 F.3d 318 (4th Cir. 2013) ................................................... 20, 50

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
  194 F.3d 505 (4th Cir. 1999) ........................................................21

*Funkhouser v. Ford Motor Co.*,
  736 S.E.2d 309 (Va. 2013) ................................................. 38, 39, 56

*Gauthreaux v. United States*,
  694 F. Supp. 2d 460 (E.D. Va. 2009) ............................................43

*Gill v. Rollins Protective Servs. Co.*,
  773 F.2d 592 (4th Cir. 1985) ................................................... 60, 61

*Hartwell v. Danek Med., Inc.*,
  47 F. Supp. 2d 703 (W.D. Va. 1999)....................................................... 33, 42, 46
*Hebel v. Sherman Equip.*,
  442 N.E.2d 199 (Ill. 1982)..................................................................24
*Hodge v. Wal-Mart Stores, Inc.*,
  360 F.3d 446 (4th Cir. 2004) ............................................................ 42, 46
*Hyundai Motor Co., Ltd. v. Duncan*,
  766 S.E.2d 893 (Va. 2014) ................................................................36
*In re TMJ Implants Prods. Liab. Litig.*,
  880 F. Supp. 1311 (D. Minn. 1995) .............................................. 25, 32
*Konkel v. Bob Evans Farms Inc.*,
  165 F.3d 275 (4th Cir. 1999)........................................................ 20, 49
*Lawson v. Doe*,
  391 S.E.2d 333 (Va. 1990) ................................................................48
*Lemons v. Ryder Truck Rental, Inc.*,
  906 F. Supp. 328 (W.D. Va. 1995)....................................................45
*Linnin v. Michielsens*,
  372 F. Supp. 2d 811 (E.D. Va. 2005)................................................21
*Logan v. Montgomery Ward*,
  219 S.E.2d 685 (Va. 1975) ......................................................... 43, 44
*McCauley v. Purdue Pharma L.P.*,
  331 F. Supp. 2d 449 (W.D. Va. 2004)................................................43
*Rector v. Approved Fed. Sav. Bank*,
  265 F.3d 248 (4th Cir. 2001)............................................................54
*Redman v. John D. Brush & Co.*,
  111 F.3d 1174 (4th Cir. 1997) ..................................................... 33, 35
*Reiss v. Komatsu Am. Corp.*,
  735 F. Supp. 2d 1125 (D.N.D. 2010) ................................................30
*Russell v. Wright*,
  916 F. Supp. 2d 629 (W.D. Va. 2013)................................................47
*Sexton v. Bell Helmets, Inc.*,
  926 F.2d 331 (4th Cir. 1991) .............................................................34
*Sherman v. Sunsong Am., Inc.*,
  485 F. Supp. 2d 1070 (D. Neb. 2007) ...............................................30
*Sloas v. CSX Transp. Inc.*,
  616 F.3d 380 (4th Cir. 2010)........................................................ 50, 51
*Smith v. Regina Mfg. Corp.*,
  396 F.2d 826 (4th Cir. 1968) ....................................................... 26, 27
*Stokes v. L. Geismar, S.A.*,
  16 F.3d 411 (4th Cir. 1994) ........................................................... 41–42

*Stokes v. L. Geismar, S.A.*,
  815 F. Supp. 904 (E.D. Va. 1993) ........................................................................42
*Swift & Co. v. Blackwell*,
  84 F.2d 130 (4th Cir. 1936) ........................................................................ 23, 26
*Torres v. Goodyear Tire & Rubber Co.*,
  867 F.2d 1234 (9th Cir. 1989) ...........................................................................32
*Turner v. Lockheed Shipbuilding Co.*,
  No. C13-1747 TSZ, 2013 WL 7144096 (W.D. Wash. Dec. 13, 2013) ........ 24, 25
*United States v. Harris*,
  27 F.3d 111 (4th Cir. 1994) ...............................................................................53
*United States v. Rhynes*,
  218 F.3d 310 (4th Cir. 2000) ..............................................................................49
*United States v. Van Eyl*,
  468 F.3d 428 (7th Cir. 2006) ..............................................................................60
*Va. Elec. & Power Co. v. Winesett*,
  303 S.E.2d 868 (Va. 1983) .................................................................................50
*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) ..............................................................................60
*Yoder v. Honeywell Inc.*,
  104 F.3d 1215 (10th Cir. 1997) ..........................................................................25

## **Other Authorities**

Restatement (Second) of Torts § 400 (1965) ................................................. 22, 25
Restatement of Torts § 400 ...................................................................................24

## **JURISDICTIONAL STATEMENT**

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332, based on complete diversity and the amount in the controversy exceeding $75,000. This Court has appellate subject-matter jurisdiction under 28 U.S.C. § 1291, and because this appeal is from the district court's judgment disposing of all parties' claims, denial of a renewed motion for judgment as a matter of law and motion in the alternative for a new trial, and sanctions order.

Ryobi Technologies noticed its appeal of the January 22, 2015 judgment on Monday, February 23, 2015. Given pending post-trial motions, which the trial court disposed of on June 26, 2015, the Court deemed the notice filed as of its receipt on July 7, 2015 of the disposition of those motions. Ryobi Technologies amended its notice on July 9, 2015.

## STATEMENT OF ISSUES

1.    Did the district court misapply the apparent-manufacturer doctrine in denying summary judgment and motion for judgment as a matter of law for Ryobi Technologies, despite its lack of involvement in the tractor's line of distribution or connection to the tractor whatsoever?

2.    Independently, did the district court misapply Virginia product liability law by affirming the verdict despite the lack of legally sufficient evidence to prove either product defect or causation under any negligence theory?

3.    Alternatively, if the Court declines to reverse and enter judgment for Ryobi Technologies, should it nonetheless grant it a new trial because of the district court's a) refusing to instruct on and striking two well-supported bases for contributory negligence, b) not following Fourth Circuit precedent on sanctions and instead applying an inapplicable standard to impose the disproportionate and unwarranted sanctions, and c) allowing the plaintiff to introduce false evidence, in violation of prior definitive rulings?

## STATEMENT OF THE CASE

On a cold, dry December 23, 2010, 88-year-old Frank Wright, who had a history of physical and mental ailments, including dementia, was driving his five-year-old lawn tractor around his yard when a fire started. Mr. Wright was unable to extract himself from the tractor, and he unfortunately died from his injuries at the scene. [J.A. 59–60.] This appeal is from the judgment rendered in the product liability action arising from that incident, brought by the plaintiff Stephen Bilenky, as the administrator of Mr. Wright's estate.[1]

### A.    Pretrial Proceedings.

#### 1.    The plaintiff sues Ryobi Technologies—despite his information that it was neither the seller nor the manufacturer of the tractor.

Within seven months after Mr. Wright's incident, the plaintiff reported it to the Consumer Product Safety Commission (CPSC), identifying Ryobi Technologies, Inc. as the tractor's manufacturer and Home Depot as the retailer [J.A. 86, 521–23.] One month later, the CPSC report identified "Husqvarna Group of Companies N. America" instead as the actual manufacturer, who responded to the report, requesting additional information. [*Id.*]

---

[1] Unless otherwise noted, reference to the plaintiff means to the estate administrator, Mr. Bilenky.

Almost two years after the incident, Mr. Wright's estate filed this action, naming eight different parties. [J.A. 33–47.] A few months later, the plaintiff dismissed four of the eight defendants before they were served or made any appearance: Ryobi, Ltd.; Ryobi North America, Inc., Techtronic Industries Co., Ltd., and Home Depot, Inc. [J.A. 66–67.]

### 2. The plaintiff obtains additional information of Ryobi Technologies' lack of involvement with this tractor.

Several months later, the plaintiff served discovery on the remaining parties, including Ryobi Technologies, asking about their involvement in or knowledge of the tractor's "design, manufacture, distribution, marketing and sale." [J.A. 69.] With the exception of the seller Home Depot, the remaining defendants—including Ryobi Technologies—answered that their involvement with this tractor was "none." [*Id.*]

As Mr. Wright's wife testified in deposition (later played at trial), Mr. Wright received an operator's manual with this tractor when he bought it in 2005. [J.A. 55.] The manual simply read "Ryobi" at the top, followed by the registered trademark symbol, but the name "Ryobi Technologies, Inc."—or even "Ryobi Technologies"—appears nowhere in the manual. [J.A. 768–97.]

The manual does, however, refer to Electrolux Home Products, Inc. on several occasions, including that the tractor's warranty—on which the plaintiff

based his express warranty claim—was provided by Electrolux.[2] [J.A. 794, 797.] The plaintiff would later acknowledge that "there were other indications that Electrolux or some other company may have manufactured this" tractor. [J.A. 86.]

The plaintiff's expert also wrote in his report that the tractor was manufactured and assembled by Husqvarna, and that the operator's manual referenced the Poulan-Pro website on the cover and elsewhere. [J.A. 128, 133, 794, 797.] The Wright's manual also had the Poulan-Pro website circled, with "Husqvarna" hand-written next to it. [J.A. 797.]

Mrs. Wright testified that the operator's manual showed the name "Ryobi" [J.A. 55], but she never testified to any belief or reliance by her or her husband that Ryobi Technologies manufactured, branded, or had any involvement with the tractor.

Similarly, Home Depot corporate representative Tim Seymour testified in deposition (played in the plaintiff's case at trial) that the "Ryobi" name appeared on the tractor, but that the "Ryobi" name didn't represent an actual company—instead, he explained, "Ryobi's a brand." [J.A. 110.] Neither Mr. Seymour nor any other witness or evidence identified "Ryobi" as being a brand name of Ryobi Technologies.

---

[2] Electrolux Home Products, Inc. spun off its outdoor products subsidiary Husqvarna in 2006. [J.A. 527.]

### 3. Ryobi Technologies' efforts to get dismissed based on its lack of involvement with this tractor.

Ryobi Technologies (along with two other entities) timely moved for summary judgment, with an affidavit from a witness with knowledge who explained that Husqvarna manufactured this tractor, and that although it "contained the 'Ryobi' name," neither Ryobi Technologies, Inc. nor any affiliated company "had any involvement in any aspect of the machine's design, testing, manufacture, distribution or sale." [J.A. 136–37.] In a pre-trial hearing, the plaintiff's counsel acknowledged that there was "no dispute" that Ryobi Technologies didn't manufacture the tractor—a fact that Magistrate Judge Miller recognized the plaintiff had been aware of for many months, at least. [J.A. 75, 88–89; *see also* J.A. 199 (plaintiff further acknowledging awareness that Ryobi Technologies was not the manufacturer).]

The district court declined to rule on Ryobi Technologies' summary-judgment motion, stating first that it was unaware such a motion was even on file. [J.A. 221.] The district court, however, dismissed two other defendants, leaving only Home Depot and Ryobi Technologies at trial. [J.A. 225–26, 229.]

**4.     The district court definitively excludes evidence of prior recalls as both irrelevant and unfairly prejudicial.**

Pre-trial, Magistrate Judge Miller excluded all evidence or testimony of several recalls of different Husqvarna-manufactured tractors. In particular, with respect to a 2004 recall, the magistrate judge found that it concerned tractors with Briggs & Stratton engines, where the clamp holding the fuel line in place to the fuel pump could abrade the fuel tank and cause a leak from the fuel tank. [J.A. 148–49.] The Wright tractor, he found, had a Kohler engine with no fuel pump, different fuel-line routing, and no fuel-line clamp next to the fuel tank wall that could abrade the fuel tank. [*Id.*] Thus, the magistrate judge excluded the 2004 recall, explaining that it was not relevant because those tractors and their potential recall concern wasn't substantially similar to either the Wright tractor or the plaintiff's defect theory of the fuel-line separating directly from outlet on the fuel tank, and that even if relevant, the probative value was substantially outweighed "by the danger of unfair prejudice, confusing the issues, misleading the jury, and needlessly presenting cumulative evidence." [J.A. 148–51; J.A. 151–52.]

7

5.    **The Court sanctions the defendants for a late disclosure of a prior incident by excluding their product design expert and reading an "admission" to the jury.**

Shortly before trial, the defense learned of and disclosed to the plaintiff an incident involving an alleged fire involving the same make and model tractor as Mr. Wright's. [J.A. 761.] The disclosure concerned an incident in Jeffersonville, Indiana, where a fire occurred involving a tractor that had been turned off and parked in a garage. [J.A. 250–53, 615–16.] The court found the Jeffersonville incident to be substantially similar. [J.A. 759.] There was no evidence, however, of any fuel-line separation (the plaintiff's theory here) in the Jeffersonville incident, nor were there any injuries from or lawsuit filed for this incident. [J.A. 252–53, 257.]

The Jeffersonville incident was in non-party Husqvarna's files, but was not discovered by the defendants until just before they disclosed it shortly before trial. [J.A. 761.] Defense expert Dan Nielsen had earlier testified in deposition that he was not aware of any other incidents involving this Wright model tractor. [J.A. 760.] Mr. Nielsen later explained that he did not recall the Jeffersonville incident at his deposition. [J.A. 323–25, 335–36.] The information concerning the Jeffersonville incident that non-party Husqvarna brought to the defense's attention refreshed Mr. Nielsen's recollection, and he corrected his earlier testimony by

errata. [J.A. 763.] The district court concluded that Mr. Nielsen's original deposition testimony was false. [J.A. 766.]

Finding a Rule 37 violation, the district court sanctioned the defendants by striking Mr. Nielsen entirely and precluding any replacement expert, and by reading to the jury an "admission" that Ryobi Technologies knew of the Jeffersonville incident and "had this information as part of their files." [J.A. 357–58, 766.] The Court later wrote in its opinion memorializing the oral sanctions ruling that "much of the information relating to the 2010 Jeffersonville, Indiana Ryobi tractor fire was in the possession of Husqvarna, the manufacturer of Plaintiff s lawn tractor and a non-party to this litigation." [J.A. 760.] The defense made an offer of proof of what Mr. Nielsen's testimony would have been at trial. [J.A. 610–18.]

## B.    Trial Proceedings.

### 1.    The plaintiff's evidence.

The plaintiff's theory of the case was that the tractor's fuel-line separated from the fuel-tank, which caused fuel to leak from the tank and be ignited, causing the fire. [J.A. 348.] To support his theory, the plaintiff called two experts: Steve Christoffersen on design, and Richard Dyer on fire damage severity. [J.A. 446–519; 359–439.]

Prior to Mr. Dyer's testimony, and based on his Rule 26 disclosure, the Court clarified that Mr. Dyer could testify that gasoline was involved in the fire, but not that the fire "started with the gasoline coming out of a hose, that came out of the tractor, and et cetera," instructing: "We're not going there." [J.A. 376.] Both the Court and plaintiff's counsel made clear that any mention of "origin" in Mr. Dyer's testimony referred only to burn patterns, and not as to the cause or source of any fuel accelerant, with plaintiff's counsel adding that whether any fuel "came from a gas can on the ground, or gas on the mower, that's someone else's job." [J.A. 378.] Mr. Dyer opined that the fire was "most probably accelerated by some type of . . . liquid fuel," and that it started by igniting gasoline, and that the most significant damage was to the left side of the mower. [J.A. 389, 401–03.] But Mr. Dyer never said how or why gasoline came to be involved in this fire. [J.A. 422–23.]

On cross-examination, Mr. Dyer admitted that he was not offering any opinion about the source of the gasoline and thus the cause of the fire, and noted that whether "the gasoline came from a split fuel tank, whether it came from a rupture of the fuel line hose, whether there was a defect with the carburetor, or whether the hose came off of the nipple, were none of my concerns. That's for, somebody else," and that he was instructed not to do any analysis beyond "origin, ignition, material first ignited, and the propagation of this fire." [*Id.*] He did not

address whether any of these four potential causes or sources for fuel involvement that he identified were more likely than another.

Mr. Christoffersen also didn't identify any opinion as to the source or cause for any fuel involvement in this fire. In addition, the Court precluded him from testifying that the fuel line separated from the fuel tank in Mr. Wright's tractor because Mr. Christoffersen was "confined to the scope of his report," which "offered no opinion . . . that the fuel line separated." [J.A. 498.] The Court also struck Mr. Christoffersen's attempted testimony regarding fuel-line separation, instructing the jury that the "any statement that the fuel line separated" in Mr. Wright's tractor "is stricken." [J.A. 500.]

Mr. Christoffersen did testify, however, as to an alleged alternative design for the Wright tractor's fuel tank, comprising a similar fuel tank but with a "more aggressive barb" on the fuel-tank outlet—a design that the manufacturer had later adopted. Mr. Christoffersen called this alternative a better design [J.A. 482], but he never performed any testing on either the Wright tractor's design or on his alternative design, such as to determine whether and under what circumstances the fuel line could come separated from the fuel-tank outlet. [J.A. 482–83.] And while he opined the tractor was defective and unreasonably dangerous based on the design of the fuel-tank outlet, Mr. Christoffersen didn't identify any government or industry standards, industry publications, customs of the tractor-manufacturing

trade, or consumer expectations that the Wright tractor's design violated. [J.A. 479–81; *also generally* J.A. 446–519.]

### 2. The defense's evidence and the plaintiff's reference to excluded recall information.

In the defense's case, Husqvarna engineer Steve Brinkman testified that the Wright tractor was manufactured in accordance with relevant American National Standards Institute (ANSI) standards. [J.A. 592.] He explained that the manufacturer conducted internal tests on the tractor regarding the fuel line and fuel system, including a fuel-line retention pull-off test, thermal tests, pressure tests, cycling tests, and a fuel-cell test. [J.A. 592–93.] In terms of Mr. Christoffersen's alternative design, Mr. Brinkman explained that Husqvarna created that tank-outlet design to work with a different type of fuel line—one not found on the Wright tractor—that was required to meet new California and EPA emissions requirements, and not because of safety issues with the Wright tractor model's design. [J.A. 539–40.]

On cross-examination, the plaintiff questioned Mr. Brinkman concerning information from one of the prior excluded recalls. The court initially instructed the plaintiff to limit his questioning to this "specific tractor here." [J.A. 572.] Over objection, however, the plaintiff asked Mr. Brinkman to admit that Husqvarna "had reports of at least three fuel line separations" of tractors "with this exact fuel tank,

exact fuel line, exact fuel clamp"—which referred to the excluded 2004 recall. [J.A. 572–74.] Mr. Brinkman denied any such knowledge. [J.A 572.] The plaintiff then showed an exhibit of a tractor included in that recall, which the court allowed over objection after the plaintiff argued—contrary to Magistrate Judge Miller's findings and holdings—that this other tractor had "the exact same fuel tank, fuel line, fuel clamp" as the Wright tractor here. [J.A. 573–74.] The plaintiff referred several other times, including in closing argument, to "at least three fuel line separations" involving the Wright tractor's design, with the Court overruling the defense's objections. [J.A. 576–79.]

The plaintiff also asked Mr. Brinkman if he was "aware of the fire earlier that year [i.e., 2010] with this same model tractor that burned down somebody's house in Indiana," referring to the Jeffersonville incident. [J.A. 584.] When Mr. Brinkman attempted to answer by explaining the circumstances of that incident, the Court shut him down, instructing that the parties were limited to the exact words of the Court's "admission." [*Id.*]

In addition to Mr. Brinkman, the defense called expert Neil Wu on fire origin and cause investigation and fire failure analysis, to respond to Mr. Dyer's testimony. Mr. Wu testified that Mr. Wright was "plowing" leaves—contrary to the manufacturer's warnings—which created a fire hazard, especially in dry conditions. [J.A. 604–06.] He also testified that there was an accumulation of

leaves and debris on the Wright tractor that was combustible and created a potential for fire, and that the operator's manual also warned of this danger. [J.A. 603–04.] As Mr. Wu explained, this danger can increase by the driver plowing leaves, thereby pushing these combustible materials into contact with the hot muffler surface. [J.A. 604–06.] Mr. Wu concluded that, based on his examination of the tractor and the fire damage, that the probable cause of the fire was an accumulation of leaves and debris on the tractor's mower deck combined with Mr. Wright's plowing leaves, contrary to the tractor's express warnings. [J.A. 603–08.]

### 3.    Evidence of Mr. Wright's physical and mental condition.

Several witnesses testified at trial about Mr. Wright's mental and physical health. Audrey Wright, his wife, testified that Mr. Wright had problems with his legs from the knees down and would sometimes fall, and that he had stopped using the lawn tractor for a long period of time. [J.A. 61–64.] She also explained that, given her concerns for his health, she had asked him not to ride the tractor on the day of the incident, but he didn't listen. [J.A. 59–60.]

One of Mr. Wright's doctors, Dr. Pontier, explained that Mr. Wright came to see him in a wheelchair, and that his peripheral nerves weren't working, leading to a loss of sensation in his muscles. [J.A. 594–95, 597.] He also noted that Mr. Wright had "motor deficits" including weakness and numbness up to his knees.

14

[J.A. 597–95.] As to his mental state, Dr. Pontier explained that Mr. Wright had dementia such that he may not be able to safely operate a motorized wheelchair, and that family members had expressed concern about his memory after he showed difficulty paying bills, dressing himself, and doing household chores. [J.A. 595–96, 599–601.] Dr. Pontier noted that as of two months before this incident, Mr. Wright's dementia had "improved" after he prescribed a new medication. [J.A. 602.]

### 4.    The Wright tractor operator's manual and warnings.

The Wright tractor's operator's manual, admitted at trial, contained numerous warnings and safety rules, including the following regarding keeping the tractor free of debris and not plowing leaves:

> - Keep machine free of grass, leaves or other debris build-up which can touch hot exhaust ⁄ engine parts and burn. Do not allow the mower deck to plow leaves or other debris which can cause build-up to occur.

[J.A. 769.] And this one, warning older users to be mindful of any limitations that may present a danger to safe operation:

> - Data indicates that operators, age 60 years and above, are involved in a large percentage of riding mower-related injuries. These operators should evaluate their ability to operate the riding mower safely enough to protect themselves and others from serious injury.

15

[*Id.*]

### 5. The court struck the defense's evidence of contributory negligence based on Mr. Wright's physical and mental infirmities and leaf accumulation, and instructed the jury not to consider it.

At the close of evidence, the court struck the evidence of Mr. Wright's physical and mental infirmities, stating that his "dementia was apparently under control," that he was able to get to the tractor using his walker that day, and that he had driven the tractor for an hour before the fire. [J.A. 624.] The court also struck the evidence of misuse based on Mr. Wright's failing to maintain the tractor per the operator's manual and allowing leaves to accumulate on the tractor. [J.A. 623.] The court instructed the jury that it "found insufficient evidence that Frank Wright was contributorily negligent based on the maintenance of the tractor or because of his physical infirmity." [J.A. 681.]

### 6. The plaintiff's closing.

In his closing, the plaintiff did not refer the jury to any evidence of any involvement by Ryobi Technologies with the design, manufacture, sale, distribution, or in any other respect of this tractor. Instead, the plaintiff referred to "Ryobi in Japan, the one at the top is Ryobi in Tokyo," despite the lack of evidence that Ryobi Technologies is a Japanese entity, or that it has any relationship to a

"Ryobi in Japan." [J.A. 674.] He also argued: "Where is Ryobi Technologies, Inc.? That's how much they value their responsibility and what they think about their responsibility of their accountability in here." [J.A. 642.]

The plaintiff also referred to the excluded 2004 recall, arguing that Mr. Brinkman "didn't know anything about the other reports of leaks with this tank that was used on a different mower," and that Husqvarna "knew about fires." [J.A. 673–74.]

The plaintiff also mentioned the "admission" in closing, arguing that the Jeffersonville incident occurred "before Mr. Wright was killed in December of 2010," and that "we all deserved at least an explanation for that, some explanation about why nobody was ever told." [J.A. 637.]

Finally, the plaintiff also noted the Court's exclusion of the defendants' contributory-negligence defenses based on Mr. Wright's physical and mental infirmity and misuse, including by arguing: "What is all that stuff designed to do? It's just designed to prejudice you against Mr. Wright, for you to say that he's not worth anything because he's an 88-year-old, he's going to die soon. That's the value the defendants put on life." [J.A. 645–47.]

## C.  Jury verdict, post-trial motions and ruling

The Court instructed the jury on negligence and implied warranty of merchantability claims with respect to both Ryobi Technologies and seller Home Depot, U.S.A. The jury found for both defendants on implied warranty, and in favor of Home Depot on negligence, but against Ryobi Technologies on negligence, awarding $2.5 million. [J.A. 755.] Ryobi Technologies thereafter renewed its in-trial motions for judgment as a matter of law, and also moved for a new trial in the alternative.

The district court denied both motions without argument. [J.A. 807–33.] In particular, it ruled that Ryobi Technologies could properly be held liable based on the apparent-manufacturer doctrine, and that the plaintiff has presented legally sufficient evidence to support the negligence verdict on his theories of design defect, failure to warn, and failure to test. [J.A. 817–26.] The court also rejected the arguments in favor of a new trial. [J.A. 826–32.]

Ryobi Technologies now timely appeals the judgment on the verdict, the Court's denial of the post-trial motions, and the sanctions order.

# SUMMARY OF ARGUMENT

Ryobi Technologies is entitled to reversal and entry of judgment in its favor for two independent reasons.

First, the district court entered judgment against Ryobi Technologies and denied its motion for judgment as a matter of law on the negligence claim despite the undisputed fact that it neither manufactured nor sold this tractor, nor had any other involvement with it. Instead, it held that Ryobi Technologies was the tractor's "apparent manufacturer" even though there was no record evidence that it had any involvement with the tractor whatsoever, and thus could not "put it out as its own." [J.A. 817–22.]

Second, the district court upheld the verdict, entered judgment on the jury's negligence finding, and denied judgment as a matter of law for Ryobi Technologies despite the lack of sufficient expert evidence, as required, to support either product defect or specific causation. Under the applicable standards of review, the district court's rulings require reversal.

If the Court does not reverse and enter judgment for Ryobi Technologies, then it alternatively asks for a new trial on multiple grounds.

First, the district court erroneously struck evidence fully supporting the plaintiff's contributory negligence and improperly instructed the jury to disregard the evidence to support that defense.

Second, in imposing sanctions, the district court applied the incorrect standard and didn't consider mandatory factors such as less drastic sanctions, resulting in improper, disproportionate, and prejudicial sanctions.

Third, the district court failed to uphold its own definitive *in limine* ruling and allowed the plaintiff to introduce and argue irrelevant, inadmissible, and unfairly prejudicial recall information and to present false evidence and argument.

The Court should reverse and enter judgment for Ryobi Technologies. Should it not, it should at a minimum grant a new trial on all issues.

## **ARGUMENT**

**I.     The district court's misapplication of the "apparent manufacturer" doctrine to hold Ryobi Technologies liable despite its lack of involvement in the tractor's line of distribution; and independently, its misapplication of Virginia product liability law in entering judgment despite insufficient evidence on defect and causation both require reversal and entry of judgment for Ryobi Technologies.**

The Court reviews the district court's denial of a Rule 50 motion for judgment as a matter of law de novo, "considering the evidence in the light most favorable to . . . the nonmoving party." *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 332 (4th Cir. 2013). But if upholding a verdict "would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered in the moving party's favor." *Id.* Granting a Rule 50(b) motion is appropriate when "substantial evidence does not support the jury's findings." *Konkel v. Bob Evans*

*Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). The Court reviews de novo the district court's determinations on these "questions of state law." *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 512 (4th Cir. 1999).

> **A.**    **The district court fundamentally misapplied the apparent-manufacturer doctrine by ignoring the plaintiff's lack of evidence to prove that Ryobi Technologies had anything to do with this tractor.**

Controlling substantive Virginia law provides for recovery only as against "*manufacturers* and *sellers* of defective products," allowing them alone to be "held liable on theories of negligence and breach of the implied warranty of merchantability." *Linnin v. Michielsens*, 372 F. Supp. 2d 811, 823 (E.D. Va. 2005). A defendant cannot be held liable for a product that it did not manufacture or sell. *See id.*

There is no legitimate dispute that Ryobi Technologies did not design, manufacture, sell, license, or distribute this tractor. The plaintiff acknowledged and admitted throughout the proceedings that Ryobi Technologies was not the manufacturer, as the district court noted. [J.A. 819.] And Ryobi Technologies filed uncontradicted sworn testimony showing its lack of involvement. [J.A. 69, 136–37.] The district court upheld the verdict and entered judgment against Ryobi Technologies based on its own interpretation of the apparent-manufacturer

doctrine. [J.A. 819–22.] But the district court fundamentally misinterpreted and misapplied that doctrine, as recognized in the Fourth Circuit.

The apparent-manufacturer doctrine, as followed by this Court, provides that one "who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400 (1965). The district court did not follow this standard. Nor did it apply the required analysis to examine whether 1) Ryobi Technologies actually "put out" the tractor and thus sold it or otherwise participated in its chain of distribution; and 2) that Ryobi Technologies put out the tractor "as its own"—i.e., that the "Ryobi" name on the tractor was actually Ryobi Technologies, Inc. and was reasonably understood by consumers to refer specifically to Ryobi Technologies, Inc.

Instead, the district court adopted an entirely new standard: "whether a reasonable jury could, under substantive Virginia law, establish *some sort of connection* between the Defendant Ryobi Technologies, Inc., and 'Ryobi,' the name on the lawn tractor and its owner's manual." [J.A. 819 (emphasis added).] The district court's new standard has no support in the law, and its application to impose liability on Ryobi Technologies is factually unsupported as well.

Ryobi Technologies was not the actual manufacturer—that much is undisputed. There is no legal or factual support for the misinterpretation and

misapplication of the apparent-manufacturer doctrine against Ryobi Technologies, which the plaintiff urged and the district court mistakenly adopted.

1.  **The apparent-manufacturer doctrine requires proof that the defendant was involved in the product's chain of production or distribution—a requirement that the district court ignored, and for which there is no record support.**

Long ago, this Court held that Virginia would follow the rule known as the apparent-manufacturer doctrine as stated in section 400 of the Restatement of Torts. *See Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 304 (4th Cir. 1962) (citing *Swift & Co. v. Blackwell*, 84 F.2d 130 (4th Cir. 1936)). The Restatement rule then in effect provided in relevant part that where the "chattel is so put out as to lead those who use it to believe that it is the product of him who puts it out," then one "who puts out as his own product chattels made by others . . . . causes it to be used in reliance upon his care in making it." *Swift & Co.*, 84 F.2d at 132 (quoting Restatement of Torts § 400). Thus, from its inception in Virginia (as elsewhere), the doctrine has required evidence that the party sought to be held liable as the manufacturer was the vendor or otherwise involved in the chain of distribution—i.e., that it actually put out the product. *Id.*; *see also Carney*, 309 F.2d at 304.

The Restatement (Second) reiterated this fundamental requirement, stating that one "who puts out as his own product a chattel manufactured by another is

subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400 (1965). Section 400's comments further clarify the requirement of "one who puts out a chattel," limiting it to a party "who supplies [the chattel] to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." *Id.* cmt. A.

Thus, the party to which the apparent-manufacturer doctrine is sought to be applied must actually be involved in the chattel's chain of production or distribution. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1463 (2d Cir. 1995). The limitation of the doctrine to those involved in that chain fits within the doctrine's purpose—to hold responsible retailers or distributors who have taken active steps to induce public reliance that the product was actually theirs. *See, e.g., Hebel v. Sherman Equip.*, 442 N.E.2d 199, 201 (Ill. 1982). For this reason, nearly "all the cases imposing liability on this basis involve defendants who were retailers or distributors." *Id.* at 202.

A recent federal-court decision succinctly explained this threshold requirement, rejecting an attempt to hold an asbestos manufacturer liable solely on the basis that it allowed its name to be used on a product but had no involvement in the chain of distribution. *Turner v. Lockheed Shipbuilding Co.*, No. C13-1747 TSZ, 2013 WL 7144096, at *2 (W.D. Wash. Dec. 13, 2013). In *Turner*, the court looked to the text and comments of Restatement section 400, noting that it "is applicable

only to one who 'puts out a chattel,' explained in the comments as one who supplies it to others." *Id.* The *Turner* court clarified that even though the comment says that an actor appears to be the manufacturer if it puts it out under his name, "this still requires the defendant 'put out' the chattel." *Id.*

*Turner* is consistent with this Court's cases as well as with cases from around the country that have held that the doctrine applies only to "sellers of a product or parties otherwise involved in the chain of distribution." *E.g.*, *Fletcher*, 68 F.3d at 1462–63; *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 156 (7th Cir. 1987) (holding that the doctrine precludes liability against a defendant that "was not involved in the manufacture, sale or installation" of the product); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. 1311, 1321 (D. Minn. 1995), *aff'd sub nom. In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484 (8th Cir. 1997) ("the apparent manufacturer doctrine does not apply when the defendants in question did not manufacture or otherwise participate in the chain of distribution of the product and the plaintiffs do not even contend that they believed that those defendants were in fact the manufacturers"); *see also Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997) (observing that the "overwhelming majority" of opinions have rejected "application of apparent manufacturer liability" to a defendant who was "not in the chain of distribution").

The Fourth Circuit cases that the district court discussed (*See* J.A. 820–21) reached the same conclusion, limiting the scope of the apparent-manufacturer doctrine to its text by applying it only to defendants as to whom there is evidence of actual participation in the product's chain of distribution:

- In *Swift & Co. v. Blackwell*, 84 F.2d 130 (4th Cir. 1936), defendant Swift & Company was a distributor who requested that another entity manufacture the evaporated milk at issue to bear the Swift & Company name, and then Swift & Company itself sold the milk to a retailer who sold the milk to the public. 84 F.2d at 132.

- In *Carney v. Sears Roebuck & Co.*, 309 F.2d 300 (4th Cir. 1962), while not the actual manufacturer, Sears, Roebuck and Company, had advertised, marketed, and put its name (Sears, Roebuck and Company) on the product at issue. 309 F.2d at 302–05. It was thus actively involved in the chain of distribution and put out the product as its own by selling it.

- And *Smith v. Regina Mfg. Corp.*, 396 F.2d 826 (4th Cir. 1968), decided under South Carolina law, involved a floor polisher-scrubber manufactured by Regina Manufacturing Corporation but sold by Sears "under the Sears' tradename 'Kenmore.'" 396 F.2d at 827. The *Smith* Court concluded that South Carolina would also "hold that by selling

26

a product under its trade name, Sears warranted its merchantability
and assumed the responsibilities of a manufacturer." *Id.* at 828. Thus,
not only was Sears the retailer, but it affixed *its* tradename to the
product that it sold.

Unlike in all of the cases on which the district court relied, there is no record
evidence of any involvement by Ryobi Technologies in the design, manufacture,
distribution, advertising, marketing, sale, or in any other respect with regard to this
tractor. The district court's opinion points to none. Rather, the district court rested
its holding solely on the notion of supposed consumer perception. [J.A. 819–21.]
But not only was that the incorrect standard, there was also—as discussed below—
insufficient evidence to support even that erroneous standard.


**2.    T**here was no evidence that Ryobi Technologies was connected to
the "Ryobi" on the lawn tractor at issue, and no evidence that it
"put out" the lawn tractor "as its own."**

Reliance here on the apparent-manufacturer doctrine further erodes because
there is also no evidence that Ryobi Technologies "put out the product *as its own*."
This is because there is no evidence tying the "Ryobi" name on the tractor to the
defendant here: Ryobi Technologies, Inc. Nor is there any record evidence to
support a reasonable contrary belief, given not only the lack of evidence
connecting Ryobi Technologies to this tractor, but the affirmative evidence

suggesting that a different entity was the actual manufacturer, as the plaintiff acknowledged.

Neither the plaintiff nor the district court pointed to any record evidence to show that Ryobi Technologies put the name "Ryobi" on this tractor. Instead, the district court cited what it labeled as "ample record evidence of Ryobi's involvement with the Wright tractor," on which it felt the jury "was entitled to find that the name Ryobi associated the tractor with Ryobi Technologies." [J.A. 819–20.] The evidence that the district court cited doesn't support its conclusion.

First, the court wrote that the jury heard "evidence from both Mrs. Wright and Home Depot's corporate representative Tim Seymour that the lawn tractor was branded by Ryobi." [J.A. 810.] This was mistaken on both counts. Mrs. Wright never testified that Ryobi Technologies "branded" the tractor. She testified only that the operator's manual showed the name "Ryobi"—she offered no testimony linking "Ryobi" to the company Ryobi Technologies, Inc., nor did she testify to any belief about who "branded" the tractor, much less whose brand it was. [J.A. 55.] Likewise, Tim Seymour never testified that Ryobi Technologies branded this tractor. Rather, he explained that he did not believe that the "Ryobi" name on the tractor even represented an actual company—instead, he explained: "Ryobi's a brand." [J.A. 110.] Thus, neither of these witnesses supported any association between "Ryobi" and the defendant Ryobi Technologies.

The Home Depot sales receipt is equally unsupportive. As the court noted, it merely "indicated that he purchased a Ryobi tractor." [J.A. 820.] It gets the plaintiff no closer to Ryobi Technologies.

And as for the operator's manual [*id.*], it actually *undermines* any purported association between this tractor and Ryobi Technologies. The district court wrote that the "jury saw portions of the owner's manual that listed Ryobi at the top." [*Id.*] The jury actually received the entire manual in evidence. [J.A. 502–03, 768.] Nowhere in that manual does the name "Ryobi Technologies, Inc." appear. Instead, there are clear indications throughout the manual that the actual manufacturer is someone *other than* Ryobi Technologies, as the plaintiff admitted [J.A. 86], including:

- the instruction to visit the manufacturer's website at www.poulan-pro.com [J.A. 768.; *also* J.A. 133];

- the identification of Electrolux Home Products, Inc. as the warrantor [J.A. 794];

- the direction to "www.poulan-pro.com/support.asp" for a parts manual [J.A. 797];

- the information that "Electrolux Home Products provides parts and services through its authorized distributors" [*Id.*]; and

29

- the statement that the "philosophy of Electrolux Home Products is to continually improve all of *its products*" [*Id.* (emphasis added)].

Rather than establishing "some sort of connection" between Ryobi Technologies and the tractor branded as "Ryobi," as the district court wrote, the operator's manual breaks any such connection, given the lack of mention of Ryobi Technologies anywhere in that manual and the repeated references to someone else as the manufacturer. *See Reiss v. Komatsu Am. Corp.*, 735 F. Supp. 2d 1125, 1133–34 (D.N.D. 2010) (applying the doctrine only after finding that the plaintiff "could not have gleaned from looking at the [product], promotional and warranty materials, and the operator's manual that" someone else was the manufacturer). Indeed, consistent with law from around the country, this Court has interpreted and applied the apparent-manufacturer doctrine to require evidence to support that "the vendee reasonably believed in and relied upon the *vendor's* apparent manufacture of the product." *Carney*, 309 F.2d at 304 (emphasis added); *also e.g., Sherman v. Sunsong Am., Inc.*, 485 F. Supp. 2d 1070, 1080 (D. Neb. 2007) (finding the apparent-manufacturer doctrine inapplicable where the name of the company did not appear on the product and there is no evidence that the plaintiffs relied on the brand name in choosing the product). There can be no reasonable belief that Ryobi Technologies was the manufacturer given the affirmative disclosures in the operator's manual.

The plaintiff's own actions further belie any such reasonable belief. For example, he originally sued three different entities with "Ryobi" in their name, undermining any purported perceived connection between Ryobi Technologies and the brand name "Ryobi" on the tractor. [J.A. 32.] Given his pre-suit and continuing knowledge concerning the identity of the actual manufacturer, the plaintiff's pursuit of any "Ryobi" entity seems deliberate, so he could argue to this Norfolk, Virginia jury that a purportedly Japanese manufacturer didn't share "American values." [J.A. 645, 674.]

To draw any connection between Ryobi Technologies and the tractor required not only ignoring affirmative evidence—including the unrebutted Cohen affidavit and the plain language in the operator's manual—but also making unsupported inferences. The district court followed the plaintiff's unsupported conflation of the "Ryobi" name on the tractor with Ryobi Technologies to circularly conclude that Ryobi Technologies "put out" the tractor as its own because it put "its" name on the tractor. [J.A. 819–20.] This circular argument lacks any factual or legal support, and has been rejected by numerous courts. *E.g.*, *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155–56 (7th Cir. 1987) (declining to apply the apparent-manufacturer doctrine to hold "The Trane Company" liable for a heater manufactured by its subsidiary "The Trane Company of Canada, Limited-Canada" because it would require the court to ignore "the fact

31

that Trane-Canada 'put out' the heater," not The Trane Company); *Torres v. Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1235–36 (9th Cir. 1989), *certified question on different issue answered*, 786 P.2d 939 (1990) (rejecting application of the "apparent manufacturer" doctrine to impose liability against Goodyear Tire & Rubber Co for a "Goodyear" tire, where it was neither the manufacturer nor the seller, and there was no evidence that it "put out" the tire); *In re TMJ Implants*, 880 F. Supp. at 1321 (rejecting application of the apparent-manufacturer doctrine against Dow Chemical and Corning for "Dow Corning" products because neither company actually manufactured the products or owned the "Dow Corning" trademark).

Under the proper analysis of the doctrine, and in light of the record evidence of this case, there is no basis to support liability against Ryobi Technologies as the apparent manufacturer. It is therefore entitled to judgment as a matter of law.

**B.      The district court misapplied Virginia product liability law by affirming the verdict despite the lack of legally sufficient evidence of both defect and causation, under any theory.**

A product-defect claim in Virginia requires legally sufficient evidence that the product "contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use" and that "the defect existed when it left the defendant's hands." *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir.

1993). The plaintiff must also prove that the unreasonably dangerous condition proximately caused the injury, which requires proof that the "product defect is the only reasonable explanation or cause of the complained-of injury." *Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 707 (W.D. Va. 1999). Because of the complexity of most product liability actions, expert testimony is generally required to prove both defect and proximate cause. *See, e.g.*, *Ball v. Takeda Pharm. Am., Inc.*, 963 F. Supp. 2d 497, 510 (E.D. Va. 2013), *aff'd*, 587 F. App'x 78 (4th Cir. 2014).

The plaintiff didn't present legally sufficient evidence to prove either defect or causation under Virginia law under any of his submitted theories: design defect, failure to warn, or failure to test. Under the proper de novo standard of review, even considering the evidence in the light most favorable to the plaintiff, judgment against Ryobi Technologies cannot stand.

**1.  The district court also misapplied Virginia law by affirming the judgment despite a lack of legally sufficient evidence to support a defect under any negligence theory.**

**a.  There was not legally sufficient evidence of a design defect.**

Virginia law requires manufacturers to make reasonably safe products, but "it does not require them to adopt the safest conceivable design." *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1177 (4th Cir. 1997). Instead, manufacturers must

only meet prevailing safety standards at the time the product is made. *Sexton v. Bell Helmets, Inc.,* 926 F.2d 331, 336-37 (4th Cir. 1991).

To determine whether a product's design meets those standards, the court must consider whether the product fails to meet applicable industry standards, applicable government standards, or reasonable consumer expectations. *Alevromagiros,* 993 F.2d at 420. A plaintiff can establish reasonable consumer expectations through "'evidence of actual industry practices, . . . published literature, and from direct evidence of what reasonable purchasers considered defective.'" *Id.* at 420–21.

The plaintiff relied solely on Mr. Christoffersen to attempt to prove alleged design defect. Yet, Mr. Christoffersen never presented the necessary evidence. He identified no applicable government or industry standards that the Wright tractor violated. The only evidence on this issue was that this tractor passed the applicable industry standards, ANSI B71.1. [J.A. 592–93.] He likewise never testified to— and the plaintiff otherwise presented no evidence of—any reasonable consumer expectations, either in the form of actual tractor-industry practices, published literature, or direct evidence from reasonable purchasers in terms of the design for this tractor. This lack of legally sufficient evidence defeats the plaintiff's claim, just as it has in numerous other cases before this Court. *E.g.*, *Alevromagiros*, 993 F.2d at 421 (affirming directed verdict for the manufacturer where the plaintiff's

expert never performed any testing on the product, testified to no customs of the trade, referred to no literature in field, and never identified any reasonable consumer expectations); *also Redman*, 111 F.3d at 1181.

Instead of presenting the types of evidence this Court has recognized as required to support a design-defect claim, Mr. Christoffersen testified merely that an alternative tank had a "better design" than the one in the Wright tractor because, in his opinion, and based solely on looking at the two tanks, the alternative tank had a "more aggressive barb," which he believed would have kept the fuel line from separating on the Wright tractor (even though the plaintiff never presented any expert evidence that the fuel line actually did separate from the tank in the Wright tractor). [J.A. 482–83.] This evidence failed to support the plaintiff's claim for several reasons.

First, Mr. Christoffersen had no opinion—and therefore never testified—that the fuel line separated from the fuel-tank outlet in the Wright tractor. [J.A. 498, 500.] Neither of the plaintiff's experts did. Thus, he could not competently—and except by his baseless "say so"—opine that the alternative fuel-tank outlet was "better" than the one on the Wright tractor at keeping the fuel line connected to the outlet.

Second, this Court in *Alevromagiros* rejected the notion that an expert can simply point to a different design and label that the standard in the industry,

explaining that a plaintiff cannot rely on "a single example" of a different product design "and purport to make it a standard in the industry." 993 F.2d at 422.

Third, to rely on Mr. Christoffersen's opinion that the alternative design was "better" required the plaintiff to produce legally sufficient evidence that design was actually better—i.e., that a fuel-line separation would not have occurred if the Wright tractor had used the alternative design. For example, in *Hyundai Motor Co., Ltd. v. Duncan*, 766 S.E.2d 893, 897–98 (Va. 2014), the Supreme Court of Virginia confirmed that a Virginia product liability plaintiff could not properly support a claim based on an expert's opinion that the "best" location for an airbag sensor was other than where the manufacturer placed it, when the expert had performed no testing or other work to show that the airbag would have deployed if placed in that location. Mr. Christoffersen never produced any such evidence because he never tested his alternative design.

Fourth, the plaintiff also failed to prove, by Mr. Christoffersen or otherwise, that the condition that he asked the jury to speculate as having occurred—i.e., the fuel-line coming separated from the fuel-tank outlet—occurred because of a design defect present when the tractor left the manufacturer's hands over five years before this incident, as opposed to because of some other reason. *See Alevromagiros*, 993 F.2d at 420 (noting the requirement to prove that the defect existed when the

product left the manufacturer's hands and that the defect actually caused the plaintiff's injury).

This Court has long held that it is "unprepared to agree that 'it is so if an expert says it is so." *Alevromagiros*, 993 F.2d at 421 (quoting *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 421 (5th Cir. 1987)). Yet that is all that the plaintiff provided—Mr. Christoffersen's "say so" that the original design for the fuel-tank outlet was defective, and that a different design was better. That is not sufficient to support a claim for design defect.

The district court's cited bases for denying Ryobi Technologies' motion for judgment as a matter of law, as renewed post-trial, don't hold up. [*See* J.A. 817–26.] It wrote that "[s]pecifically, Mr. Christoffersen told the jury that the 'subject Ryobi riding lawn tractor . . . was manufactured . . . in a defective condition which rendered it unreasonably dangerous for its intended purposes and foreseeable uses" [J.A. 822–23], but there is nothing specific at all about that testimony. It is simply generic, boilerplate *ipse dixit*, and insufficient under *Alevromagiros* to support the plaintiff's claim. *See* 993 F.2d at 420.

The district court's reliance on other purported supporting evidence, including "eyewitness testimony of Mr. Wright's wife, testimony about the fire and smoke from first responders and members of the Chesapeake Fire Department, photographs of the scene, and two physical models of the fuel tanks in question"

37

[J.A. 823], likewise provides no support. Indeed, the district court doesn't explain the relevant probative value of any of this evidence, much less how it satisfies the requirements laid out in *Alevromagiros* for proving product defect.

The plaintiff's failure to present legally sufficient evidence to prove design defect requires reversal and judgment as a matter of law for the Ryobi Technologies on that issue.

### b.   There was not legally sufficient evidence to support a negligence finding based on failure to warn.

A failure-to-warn claim in Virginia requires proof that the defendant knew or had reason to know that the product was or was likely to be dangerous. *Featherall v. Firestone Tire & Rubber Co.*, 252 S.E.2d 358, 366 (Va. 1979). The plaintiff may support this burden using evidence of similar incidents only if the incidents "occurred under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue." *Funkhouser v. Ford Motor Co.*, 736 S.E.2d 309, 313–14 (Va. 2013) (internal quotation marks and citations omitted). As the Supreme Court of Virginia has made clear, substantial similarity requires proof that the other incidents were the result of the same cause, and not merely that they involved the same effect. *See id.* at 314–15. The *Funkhouser* court specifically rejected the plaintiff's request there to "infer similar causes, i.e., defects, from the existence of similar effects, i.e., fires." *Id.*

38

At the outset, there is no basis for any alleged failure to warn as against Ryobi Technologies for the basic reason that it was not the manufacturer and had nothing to do with this tractor. Nonetheless, the plaintiff (and the district court) relied on two bases to infer knowledge of a dangerous condition on the part of Ryobi Technologies: the Jeffersonville incident, and the three incidents noted in the 2004 recall. [J.A. 825.]

The Jeffersonville incident doesn't support any basis for knowledge of a danger for the same reason that similar evidence failed to do that in *Funkhouser*. There is no evidence in the record—including in the admission itself—indicating the cause of that incident, much less anything to properly support that the cause was a fuel line separating from the fuel-tank outlet. To allow the plaintiff to rely on the Jeffersonville incident to prove actual notice and knowledge would require an inference of "similar causes, i.e., defects, from the existence of similar effects, i.e., fires"—which Virginia law forbids. *Funkhouser*, 285 Va. at 283, 736 S.E.2d at 316.

The "at least three prior fuel line separations" from the 2004 recall on which the district court relied was likewise improper and insufficient. [J.A. 825.] First, the record shows plainly and unequivocally that those incidents resulted from an entirely different cause than the plaintiff's fuel-line separation theory; they did not result from fuel-line separations at all, but rather resulted from the fuel clamp

39

abrading the tank, which the plaintiff has never maintained was the cause of the Wright incident. [J.A. 148–49.] The district court's statement that these other incidents involved fuel-line separations is simply incorrect. Second, the district court's reliance on those incidents is further improper given that they were properly excluded as irrelevant and unduly prejudicial, the district court affirmed that ruling, and it never overruled or reversed that ruling. Third, there is no evidence to support any conclusion that Ryobi Technologies had any knowledge of the 2004 recall incidents, since the only evidence is that it had nothing to do with this tractor.

There is no legally sufficient evidentiary basis for the judgment based on negligent failure to warn, requiring judgment as a matter of law on this issue as well.

### c.     There was not legally sufficient evidence to support a negligence finding based on failure to inspect or test.

Virginia hasn't recognized a claim for alleged failure to test as a basis for product liability against a (purported) manufacturer. *See Ball,* 963 F. Supp. 2d at 506. In addition, the jury was instructed not to consider any alleged failure to test with respect to Ryobi Technologies, as the district court specifically instructed that this claim applied only to the seller, Home Depot. [J.A. 685, 754.] The plaintiff

cannot rely on a theory of failure to test when the instructions to which he never objected told the jury that such a theory did not apply to Ryobi Technologies.

This theory also failed as a matter of law for the same reason that the design-defect theory failed—there is insufficient evidence of any defect or unreasonably dangerous condition.

The district court didn't address these issues, and instead found "a legally sufficient evidentiary basis for the jury to draw a conclusion regarding Defendants' negligent failure to inspect or test the tractor" based on two things: Steve Brinkman's evidence of actual manufacturer testing, and Steve Christoffersen's "testimony about differences in designs between the two fuel tank designs." [JA. 823.] Neither supports the judgment. Mr. Brinkman's testimony negates any supposed failure to test because he testified to extensive product testing—and his testimony was the *only* evidence on testing. [J.A. 592–93.] Mr. Christoffersen's comparison of the two tanks and outlets *that he never tested* likewise provides no support. There is simply no factual or legal basis for upholding the verdict and judgment on a theory of failure to test either.

**2.     The judgment likewise lacks legally sufficient evidence to support causation under any negligence theory.**

Under Virginia law, if "there is more than one possible cause of injury, the plaintiff must also show that the defendant caused the injury." *Stokes v. L.*

41

*Geismar, S.A.*, 16 F.3d 411 (4th Cir. 1994). Recovery is barred "where responsibility is conjectural." *Stokes v. L. Geismar, S.A.*, 815 F. Supp. 904, 908 (E.D. Va. 1993), *aff'd*, 16 F.3d 411 (4th Cir. 1994). Thus, "where there is more than one possible cause of an injury, the plaintiff must show with reasonable certainty that the defendant caused the injury." *Id.*

A plaintiff's case also fails "if it appears from the evidence just as probable that damages were caused by one as by the other because the plaintiff must make out his case by a preponderance of the evidence." *Id.* This means that testimony that it was merely possible that an alleged defect caused an injury is insufficient— rather, to "succeed on a products liability claim, the plaintiff must demonstrate that a product defect is the only reasonable explanation or cause of the complained-of injury." *Hartwell*, 47 F. Supp. 2d at 707. In other words, a plaintiff must "prove '*why* and *how* the incident happened'; 'if the cause of the event is left to conjecture, guess, or random judgment, the plaintiff cannot recover.'" *Hodge v. Wal-Mart Stores, Inc.,* 360 F.3d 446, 451 (4th Cir. 2004).

The same is true for a failure-to-warn claim: a plaintiff must prove that the warning defect proximately caused the injury. *See Butler v. Navistar Int'l Transp. Corp.*, 809 F. Supp. 1202, 1208 (W.D. Va. 1991). And since Virginia hasn't recognized a heeding presumption, *Cotton v. Buckeye Gas Prods. Co.*, 840 F.2d

935, 942 n.3 (D.C. Cir. 1988), the plaintiff must prove that he would have followed a specific warning if it was provided.

Moreover, because "of the complexity of the causation facts," proof of causation in a product liability case must ordinarily be supported by expert testimony. *McCauley v. Purdue Pharma L.P.*, 331 F. Supp. 2d 449, 464 (W.D. Va. 2004); *Gauthreaux v. United States*, 694 F. Supp. 2d 460, 465 (E.D. Va. 2009) (same). In *McCauley*, for example, the court held that where the plaintiff's expert opined that the plaintiff's medical condition began while he was taking the medicine manufactured by the defendant but did not "eliminate the possibility" that other drugs were to blame for his injuries, his proximate cause evidence was insufficient. *Id.* at 463.

As with the issue of product defect, and under a de novo review, it is apparent the plaintiff likewise didn't produce legally sufficient evidence of causation as to any negligence theory, requiring judgment as a matter of law for Ryobi Technologies.

### a.    There was not legally sufficient evidence of causation with respect to any design defect.

In Virginia's seminal product-liability case, *Logan v. Montgomery Ward*, the court upheld a motion to strike the plaintiff's case based on his failure to prove that an explosion involving a stove was actually caused by an alleged defect. 219

S.E.2d 685 (Va. 1975). The plaintiff presented evidence that a defect in the stove or gas line could cause gas to build up in the stove until it leaked out. *Id.* at 687. He also presented evidence that someone smelled gas near the stove the day before the fire. *Id.* The *Logan* court concluded, however, that the mere fact of an explosion legally insufficient to support that a defect existed, or that the alleged defect caused the explosion. *Id*. at 687–88. As the court explained, what "caused the gas leak was not testified to by any witness," thus there was insufficient evidence for a jury to infer that the gas leak must have been caused by a defect in the stove. *Id.* Recognizing that "while there may be a suspicion that the explosion did occur because of" a defect, the *Logan* court held that the evidence was insufficient to "eliminate the possibility that the blame attaches to some party other than" the manufacturer. *Id.* at 688.

Here, the plaintiff likewise never presented any expert testimony to prove that the fire was caused by his alleged defect—i.e., that the fuel line separated from the fuel-tank outlet in the Wright tractor, and that the fire was caused by that separation. Mr. Christoffersen never provided any such testimony, nor did Mr. Dyer. To the contrary, Mr. Dyer testified as to four equally possible causes:  (1) "a split fuel tank"; (2) "a rupture of the fuel line hose"; (3) "a defect with the carburetor"; or (4) a "hose that came off the nipple." [J.A. 422–23.] But neither he

nor Mr. Christoffersen excluded any of those other causes. Thus, the plaintiff's evidence left the jury only to speculate as to what happened here.

The plaintiff's proof also fell short in that he presented no evidence that any alleged separation of the fuel line from the fuel-tank outlet resulted from the alleged design defect. Mr. Christoffersen testified that the alternative tank had a "better" design, but neither he nor anyone else testified that a fuel-line separation would not have occurred in this five-year-old tractor even with his alternative design. This lack of evidence is fatal, given Virginia's "but for" standard for tort liability, which establishes that unless he proves that the alternative design "would in fact have prevented the accident from occurring, plaintiff cannot establish causation." *Lemons v. Ryder Truck Rental, Inc.,* 906 F. Supp. 328, 344 (W.D. Va. 1995).

The plaintiff finds no support in relying on a circumstantial-evidence argument, either, because such evidence is sufficient only when "it tends to eliminate all reasonable possibilities that some other party or cause is to blame for the accident," and "the facts are such that no other inference but the existence of a defect . . . is reasonable." *Lemons*, 906 F. Supp. at 333. The plaintiff never ruled out other reasonable possibilities—most notably, the other three causes that Mr. Dyer identified.

The district court wrote, in denying the post-trial motions, that the plaintiff only had to "prove causation by a preponderance of the evidence—that it is more likely than not to be true." [J.A. 824.] But it failed to apply that standard because, in the very next sentence, it wrote that the plaintiff carried this burden because Mr. Dyer testified that "a fuel led fire was *a possibility*, and that weather and an accumulation of leaves were *significantly less likely* to have been the cause." [*Id.* (emphases added).) Thus, according to the district court itself, the plaintiff not only failed to prove causation to the requisite standard of probability—proving only a "possibility"—he also didn't exclude alternative reasonable possibilities—proving only that they were "significantly less likely," but not excluded. *See Hartwell*, 47 F. Supp. 2d at 707.

Moreover, contrary to the district court's description, Mr. Dyer never testified that this was a "fuel-*led* fire." He testified, per the Court's limitations, that this was a "gasoline-*fed* fire," meaning simply that "gasoline was involved in this particular fire." [J.A. 376.]

The judgment here relied purely on speculation and guesswork, asking the jury to do what the plaintiff's experts themselves couldn't do and didn't do— exclude other reasonable possibilities and draw a proximate-cause connection between their alleged defect and this fire. *See Hodge*, 360 F.3d at 451; *Hartwell*, 47 F. Supp. 2d at 707. That is the very definition of a judgment that cannot stand.

46

### b.   There was not legally sufficient evidence of causation with respect to any failure to warn.

A failure-to-warn claim also requires evidence that any alleged failure proximately caused the harm. *Butler* , 809 F. Supp. at 1208. As a matter of law, the Court should reject any invitation to go where the Supreme Court of Virginia has not yet gone and recognize a theory of post-sale duty to warn. But regardless of whether the plaintiff relies on a pre- or post-sale warnings theory, he had to show that a specific warning could have been "effectively communicated to and acted upon by those to whom a warning might be provided." *Russell v. Wright*, 916 F. Supp. 2d 629, 650–52 (W.D. Va. 2013). He didn't do so.

The plaintiff presented no evidence—expert or otherwise—of what any specific warning should have said, how it should have been conveyed, or how it would have been received and understood, either in general or specifically by Mr. Wright. And he presented no evidence to support that a warning—either pre- or post-sale—would have made any difference to Mr. Wright or that he would have followed it. *Cf. Butler*, 809 F. Supp. at 1207 (requiring proof of proximate cause for a warnings claim). There was no evidence that Mr. Wright even read the warnings provided with his tractor. There is no evidence to support that any additional warnings—whatever it may have been—would have changed anything and, therefore, no proximate cause. Indeed, the only evidence regarding warnings is that Mr. Wright *disregarded* the existing warnings.

47

The district court wrote that the jury's verdict was sufficiently supported because "there is sufficient evidence in the record that such a warning *could* have" prevented this incident. [J.A. 825.] But again, the court misapplied the standard. Proximate cause requires "probable certainty." *Lawson v. Doe*, 391 S.E.2d 333, 335 (Va. 1990). "Could have" is not probable certainty. It is speculation and guesswork. And it is insufficient to sustain a verdict.

### c. There was not legally sufficient evidence of causation with respect to any failure to test.

In addition to the fact that there is no such claim against a (putative) product manufacturer, there was also a total lack of causal nexus here between the alleged failure to inspect or test and the fire. There is no evidence that a pre-sale inspection or test would have revealed the plaintiff's alleged defect—i.e., a propensity for the fuel line to separate from the fuel tank. The plaintiff's experts performed no testing, much less any testing that would have revealed an alleged propensity for the fuel line to separate from the tank.

The failure-to-inspect/test theory further fails for lack of proximate cause because the plaintiff never proved the actual cause of this fire. He didn't rule out the three other potential causes of the fire that Mr. Dyer identified. Thus, there is no evidence of what specifically should have been inspected or tested, nor any evidence as to how any such failure to inspect or test made a difference. Thus, as

with the other theories, there was no legally sufficient evidence to support causation.

## II. If the Court does not reverse and enter judgment for Ryobi Technologies, it should nonetheless grant a new trial due to several harmful, prejudicial, and reversible errors.

This Court reviews the denial of a new trial motion under Rule 50(b) for abuse of discretion. *Konkel*, 165 F.3d at 279. However, issues of law are reviewed de novo. *United States v. Rhynes*, 218 F.3d 310, 315 (4th Cir. 2000) (en banc). The district court made several significant errors that require a new trial.

First, the court struck the defendants' contributory negligence defense on two bases: 1) 88-year-old Mr. Wright's using this tractor despite sufficient evidence of his mental and physical infirmities and the tractor's express warnings; and 2) improper maintenance of the tractor by allowing significant leaf accumulation, again, contrary to the product warnings.

Second, the district court applied an erroneous standard with respect to sanctions and ordered an unwarranted and disproportionate sanction.

Third, the district court ignored its prior, definitive *in limine* ruling and allowed the plaintiff, over repeated objections, to introduce and argue in closing false evidence concerning an irrelevant recall.

Each of these was harmful, prejudicial, reversible error, warranting a new trial. Together, they require one.

### A. The district court usurped the jury's role when it struck two bases for the contributory negligence defense, despite sufficient evidence, and then compounded the error with an improper and prejudicial jury instruction.

Whether the trial court erred in refusing to instruct the jury on an affirmative defense "raises a question of law," which the Court reviews "de novo." *Fontenot*, 736 F.3d at 326–27. The Court must reverse a verdict based on an improper jury instruction when it is prejudicial "based on a review of the record as a whole." *Figg v. Schroeder*, 312 F.3d 625, 640 (4th Cir. 2002).

Under Virginia law, contributory negligence exists when "a plaintiff fails to act as a reasonable person would have acted for his own safety under the circumstances." *Artrip v. E.E. Berry Equip. Co.*, 397 S.E.2d 821, 824 (Va. 1990). "As a general rule, contributory negligence is a jury issue," *Va. Elec. & Power Co. v. Winesett,* 303 S.E.2d 868, 872 (Va. 1983), unless reasonable minds could not differ on the issue. *Artrip*, 397 S.E.2d at 823.

As this Court has instructed, the defendant "is entitled to a contributory negligence instruction" on any issue for which there is "any evidence to support that theory." *Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 392 (4th Cir. 2010). In addition, because damages and contributory negligence are also so interwoven, it

50

"would be rare" to submit the case to the jury on damages without allowing in evidence relating to the plaintiff's conduct around the time of the incident. *Id.*

Viewed under the applicable de novo standard, and viewing the record as a whole, the trial court committed reversible error in striking the contributory negligence defense based on 1) Mr. Wright's failure to account for his significant physical and mental impairments, as specifically warned about in the operator's manual [*E.g.*, J.A. 620–22], and 2) his failure to properly clean and maintain the tractor, which was also contrary to the warnings. [J.A. 770, 783.]

The record reflected sufficient evidence of Mr. Wright's mental infirmity. Despite that evidence, the district court usurped the jury's role by weighing that evidence, such as by characterizing Mr. Wright's doctor's testimony as being that his "dementia was apparently under control." [J.A. 623.] The doctor didn't say that—he testified only Mr. Wright's dementia had "improved" with a new medication. [J.A. 602.] Indeed, the doctor had also testified that Mr. Wright was suffering from dementia such that he may not be able to safety operate a motorized wheelchair, and that family members had expressed concern about Mr. Wright's memory given his difficulty in paying bills, dressing himself, and doing household chores. [J.A. 595–96, 599–601.] The jury was entitled to consider all of this evidence and determine what weight to give it, including whether someone with

51

merely "improved" dementia should have been trying to operate a piece of gas-powered machinery.

The Court excluded evidence as to Mr. Wright's physical impairments because it found that he was able to get to the tractor that day using his walker, and that he used the tractor without incident for an hour, and that there was insufficient evidence that his physical condition had anything to do with causing his injuries. [J.A. 622–24.] But once again, these issues go only to the weight of the evidence, because there was also substantial evidence that Mr. Wright had long suffered from a number of severe physical limitations relevant to his ability to maintain, maneuver, and extract himself from a piece of gas-powered machinery. His doctor testified that Mr. Wright's peripheral nerves weren't working so that he had trouble feeling things; he had been using a wheelchair; and had "motor deficits" including weakness and numbness up to his knees. [J.A. 594–601.] His wife also testified that she knew that he was infirm, had tried to get him off the tractor that day, and that he had problems with his legs and would fall at times. [J.A. 59–64.]

The trial court recited the proper standard—i.e., that "whether one was contributorily negligent is one for the jury to decide unless no reasonable minds could differ on the issue." [J.A. 829.] But it erred in applying that standard. There was sufficient record evidence on which reasonable minds could find contributory negligence. Indeed, Magistrate Judge Miller—certainly a reasonable person, and

who was well familiar with the evidence—recognized pre-trial that this was a "very, very, very compelling case for contributory negligence" based on "Mr. Wright's physical condition" and "his ability to exit the lawn mower when this fire did happen." [J.A. 194–95.] The trial court therefore erred in preventing the jury from considering the issue of contributory negligence on grounds of Mr. Wright's physical and mental infirmities—especially given the combination of those infirmities.

The same is true regarding the court's failure to instruct the jury on the issue of Mr. Wright's contributory negligence on grounds of misuse of the tractor based on his failure to properly maintain it. Defense expert Neil Wu explained that failure—about which the tractor's operator's manual warned—was a likely cause of the fire. [J.A. 603–06.] Any concerns with Mr. Wu's testimony were for cross-examination, and did not support striking this evidence as grounds for the contributory-negligence defense.

The district court compounded the error in striking the evidence with its prejudicial jury instruction. As this Court has recognized, where the jury is instructed in accordance with an erroneous evidentiary ruling, the instruction compounds the error. *United States v. Harris*, 27 F.3d 111, 114 (4th Cir. 1994). That is what happened here—the district court instructed the jury that the court had weighed the evidence and found insufficient evidence to allow the jury to consider

53

contributory negligence based on Mr. Wright's physical and mental infirmities or his improper maintenance. [J.A. 681.]

Review of the record as a whole further illustrates the error and prejudice. *See Figg*, 312 F.3d at 640. The plaintiff capitalized on the district court's erroneous ruling and jury instruction to prejudicial effect in his closing, emphasizing several times the striking of these bases for the defense. [J.A. 645–48, 672, 675.]

The issues of Mr. Wright's physical and mental infirmities and his improper maintenance of the tractor had sufficient evidentiary support. Striking them and instructing the jury not to consider them on contributory negligence was harmful, prejudicial, and reversible error, requiring a new trial.

### B.    The district court applied the wrong test under Rule 37, resulting in unwarranted and disproportionate sanctions.

This Court generally reviews the district court's grant of sanctions under Rule 37 for an abuse of discretion. *Barlow v. Colgate Palmolive Co.*, 772 F.3d 1001, 1007 (4th Cir. 2014). However, while the Court reviews "the district court's factual findings for clear error," it reviews "its legal conclusions de novo." *Rector v. Approved Fed. Sav. Bank*, 265 F.3d 248, 251 (4th Cir. 2001) (internal citations omitted). Moreover, an error of law in deciding on sanctions or a related evidentiary issue is "by definition an abuse of discretion." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 260 (4th Cir. 2005).

This Court "has developed a four-part test for a district court to use when determining what sanctions to impose under Rule 37." *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998). Specifically, the court "must determine (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Id.* (citing *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 503–05 (4th Cir. 1977)).

The district court didn't apply this longstanding test from *Wilson*. It didn't recite this test, or even cite *Wilson*. Instead, it applied a different, *five*-factor test relating to Rule 37(c)(1), which governs situations where a party attempts to use evidence at trial that it previously failed to supplement or disclose—which was not this situation. [*See* J.A. 758 (citing Fed. R. Civ. P. Rule 37(c)(1)); *id.* at 9 (following *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)).]

Under the appropriate de novo standard of review, the district court's failure to apply the four-part *Wilson* test, and instead its misapplication of an inapplicable test, was an error of law. The district court's error of law is reflected in its attempt to apply the inapplicable test on which it relied. For example, the sanction here followed the defendants' disclosure of an incident that a non-party brought to their

55

attention, which the defense had no intention of using at trial. As a result, the test applied by the district court addressed irrelevant issues, such as the surprise on the party against whom the evidence would be offered—Ryobi Technologies had no intention of offering this evidence. *See S. States Rack & Fixture*, 318 F.3d at 597. At the same time, the district court ignored key elements of the *Wilson* test, perhaps most importantly, whether less drastic sanctions than those imposed would have been appropriate. This error of law in applying the wrong test for whether and to what extent the sanctions are appropriate requires reversal.

Moreover, an examination of the four *relevant* factors from the proper *Wilson* test highlights both the inappropriateness of the test that the district court applied, as well as the abuse of discretion in the ultimate sanctions imposed. In particular, under the applicable *Wilson* factors, the second and fourth factors— prejudice and less drastic sanctions (which the court's ruling does not reflect that it considered)—were particularly wanting.

As for prejudice, the district court rested its sanctions order on the fallacy that the Jeffersonville incident was "substantially similar," which is one of the requirements under Virginia law for the admission of purported "other similar incidents" into evidence. *See Funkhouser*, 736 S.E.2d at 313–14. The plaintiff's theory—despite their lack of expert testimony on it—was that the fire occurred due to a fuel-line separation. [J.A. 348.] But there is no evidence that the Jeffersonville

incident involved a separation of the fuel-line from the fuel-tank outlet. Moreover, the incident here occurred while Mr. Wright was operating the tractor, while the Jeffersonville incident occurred after the tractor was stored in a garage. [J.A. 358.] These material differences and the lack of substantial similarity mean that the Jeffersonville incident wasn't even admissible. Thus, there was no prejudice in the plaintiff learning of that incident when he did.

In addition, less drastic sanctions were certainly available and more appropriate to address the district court's concerns. But this was not part of the district court's analysis, according to its memorandum opinion. [J.A. 757–67.] The principle of proportionality of the sanctions to the perceived offense has deep roots in the Fourth Circuit, which has long held that even where the other party has its case "jeopardized or prejudiced," the sanction "must be no more severe than is necessary to prevent prejudice to the movant." *Wilson*, 561 F.2d at 504.

At the outset, any prejudice or jeopardy to the plaintiff's case was non-existent—minimal, at most. Thus, any sanction should likewise have been either non-existent or minimal, at most. But it wasn't. The sanctions here amounted to a crippling—if not *de facto* elimination—of the defense's design case by excluding design expert Mr. Nielsen, and turned an irrelevant incident into what appeared to be a damning "admission" by the defense.

57

The "admission" concerning the Jeffersonville incident was based on incomplete facts, as the defense showed. [J.A. 610–18.] Yet the court allowed the plaintiff to use it in a way that suggested not only that Ryobi Technologies was the manufacturer, which it was not, but that Ryobi Technologies admitted that the Jeffersonville fire occurred due to the plaintiff's defect theory—a fuel-line separation. But there was no evidence that the Jeffersonville incident resulted from a fuel-line separation. Even if the court allowed this dissimilar incident into evidence, it should have allowed the defendants to explain and distinguish it. Instead, the district court expressly precluded that, even when the plaintiff opened the door by questioning witnesses about the Jeffersonville incident, and then argued in closing that the defendants failed to explain it. [J.A. 442–45.]

The plaintiff compounded the misleading and unfairly prejudicial nature of the "admission" by repeatedly referring to it. [J.A. 348–50, 442–43, 584, 637, 673.] This turned what was an irrelevant other incident into the plaintiff's "smoking gun" and the linchpin of his case. The plaintiff likewise seized on Mr. Nielsen's exclusion, arguing that that the defense never brought anyone to defend this tractor's design or to counter his expert. [J.A. 654.]

Numerous less severe sanctions were available to alleviate any perceived prejudice on the plaintiff, while not unduly prejudicing the defense. For example, a short pre-trial or in-trial deposition of Mr. Nielsen—at the defense's expense—on

the Jeffersonville incident was an option, as was cross-examination of Mr. Nielsen's testimony about the Jeffersonville incident. These options would have allowed the jury to determine if his testimony was "false" and, if so, what weight that issue deserved, which surely would have cured any prejudice suffered. *See Wilson*, 561 F.2d at 504. The district court could have also granted a short continuance for the plaintiff to conduct limited discovery on the Jeffersonville incident, especially given that the plaintiff has requested and received a continuance only a few months earlier.

The district court never indicated that it considered these options, nor did it explain any other less drastic options, if any, that it considered. Its order doesn't mention any. [*See generally* J.A. 757–67.] It does, however, mention that the court considered *more* severe sanctions than it ultimately imposed. [J.A. 766–67.]

As for the other first and third *Wilson* factors—bad faith and deterrence—they were likewise wanting. The district court's order doesn't mention bad-faith, nor did it discuss deterrence, because these were not elements of the incorrect test that the court applied. There was no bad faith and, as a result, no need for deterrence. There was only an inadvertent omission, which was promptly corrected once discovered.

The district court's misapplication of the wrong test for sanctions was an error of law which, by definition, is an abuse of discretion. *See Anderson*, 406 F.3d

at 260. Moreover, the facts here don't support sanctions, even under the proper test. Thus, the Court should overturn and vacate the sanctions order, and, given the impact of the erroneously granted sanctions on the proceedings, grant a new trial on all issues.

**C.    The district court abused its discretion in allowing the plaintiff to present false evidence that the court had already excluded in a prior ruling.**

The Court reviews a district court's evidentiary decisions for abuse of discretion, which occurs when a court's "conclusion is guided by erroneous legal principles, or rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). A new trial is necessary where improper admission of prejudicial evidence could have affected the verdict. *See* 12 Moore's Fed. Practice § 59.13[2][b][i][E]. The same is true where the verdict rests on false evidence or will result in a miscarriage of justice. *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 594 (4th Cir. 1985). In particular, a violation of a clear and specific *in limine* order that prejudices the other party warrants a new trial. *E.g., United States v. Van Eyl*, 468 F.3d 428, 429 (7th Cir. 2006).

Here, the plaintiff repeatedly violated the district court's *in limine* order—which the magistrate judge granted, the trial court affirmed, and was never reversed—that the plaintiff must not introduce or discuss any recall evidence, in

particular, the 2004 recall. The plaintiff induced the trial court to violate that definitive pre-trial ruling on misleading assurances that the 2004 recall involved "the exact same fuel tank, same clamp, same line," when the plaintiff knew from the lengthy pre-trial proceedings and Magistrate Judge Miller's detailed ruling that the reason the 2004 recall was not relevant and inadmissible is because the *reason* for the recall concern was entirely different from the plaintiff's defect theory.

Allowing this misconduct in violation of the trial court's *in limine* ruling meant that the jury heard irrelevant and unfairly prejudicial, dissimilar incidents, leading to an unsupportable verdict based on false evidence. *See Gill*, 773 F.2d at 594. The plaintiff capitalized on his own misconduct by arguing in his closing that "Mr. Brinkman didn't know anything about the other reports of leaks with this tank that was used on a different mower," and that the manufacturer "knew about fires." [J.A. 673.]

The district court didn't deny that the plaintiff violated the *in limine* ruling. In fact, the court's ruling is entirely vague on this issue. The plaintiff did not mention the word "recall." But the fact remains that the plaintiff violated that ruling by mentioning the irrelevant, inadmissible and excluded content of it based on materially misleading statements concerning that evidence, which resulted in false evidence being presented to the jury. Given the emphasis that this improper evidence was given both by the plaintiff—including in his closing—*and* by the

61

district court in denying the post-trial motions [J.A. 825], its admission was plainly harmful, thereby requiring a new trial.

## <u>CONCLUSION</u>

There is no legal or factual basis to support the verdict and judgment against Ryobi Technologies, which had nothing to do with this tractor. In addition, there was no legally sufficient evidence of defect or causation to support the negligence jury's verdict. For these reasons, Ryobi Technologies is entitled to and asks to have the judgment set aside and vacated, and for judgment in its favor.

In the alternative, due to the district court's errors of law in striking multiple bases for a contributory-negligence defense and in imposing sanctions, as well as the allowance of false evidence, Ryobi Technologies is entitled to and asks for a new trial on all issues.

Respectfully submitted,


RYOBI TECHNOLOGIES, INC.


By: <u>/s/ Robert L. Wise_____</u>
Robert L. Wise
Davin M. Rosborough
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650
Richmond, VA 23219
(804) 649-8200

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Ryobi Technologies respectfully submits that oral argument is appropriate for several reasons. The "apparent manufacturer" issue has seen little discussion in the Fourth Circuit in the past 50 years. Not only does the paucity of case law in general weigh in favor of affording full consideration and exploration of this issue, but so does the lack of recent case law.

The district court's misapplication of Virginia product liability law in allowing this case not only to survive summary judgment and judgment as a matter of law, but to result in a plaintiff's verdict that survived post-trial motions also sets bad precedent for other similar cases. Upholding this judgment based on this legally insufficient evidence would run contrary to Virginia product liability law, which further militates in favor of full review, including argument.

The district court's failure to apply the proper standard for imposing sanctions under Rule 37 presents an issue of Circuit-wide import, as it presents a stark deviation from longstanding Fourth Circuit precedent. Full consideration, including argument, is appropriate to ensure that this issue is addressed and this deviation is curbed.

The remaining issues—the striking of the evidence on affirmative defenses and the admission of inadmissible recall evidence—also present significant issues worth full consideration.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1. **Type-Volume Limitation**: Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of 32(a)(7)(B) because:

[ X ] this brief contains [**13,982**] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii);

2. **Typeface and Type Style Requirements**: A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using [Microsoft Word] in [Times New Roman 14-point].

By:  _/s/ Robert L. Wise

Attorney for: <u>Ryobi Technologies, Inc.</u>

Dated: <u>September 29, 2015</u>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 29, 2015 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Robert L. Wise_____          _September 29, 2015_____